KNIGHT (UNITED STATES v.). See Case No. 15,539.

KNIGHTS, The L. T. See Case No. 8,585.

## Case No. 7,889.

### KNOEDLER v. SCHELL.

[4 Blatchf. 484;[1] 20 How. Pr. 216.]

Circuit Court, S. D. New York. Jan. 2, 1861.

CUSTOMS DUTIES—OVERCHARGE PAID UNDER PROTEST—JUDGMENT AGAINST COLLECTOR —EXECUTION.

1. At common law, an action for money had and received lies against a person who wrong-

fully withholds goods from another, colore officii, upon an illegal claim or demand, and thus compels him to pay money to obtain them.

2. The act of March 3, 1839 (5 Stat. 348, § 2), took away that common law right, as respected suits against a collector of customs to recover back duties illegally exacted on importations.

3. The act of February 26, 1845 (5 Stat. 727), restored such common law right, and, under it, an execution can issue against a defendant, to recover from him personally the amount of a judgment obtained against him for duties illegally exacted by him, as a collector of customs.

This was a motion by the defendant in this suit to set aside an execution issued upon a judgment rendered in the suit. The suit was brought [by Michael Knoedler] to recover back an excess of duties illegally exacted by the defendant [Augustus Schell], as collector of the port of New York, on the importation of merchandise, and paid under protest. [Case No. 7,890.]

Almond W. Griswold, for plaintiff.

James I. Roosevelt, Dist. Atty., for defendant.

SMALLEY, District Judge. The defendant claims that, under the acts of congress of the 3d of March, 1839 (5 Stat. 348, § 2), and the 26th of February, 1845 (Id. 727), an execution in this case could not rightfully issue against his private property; that the intention and true construction of the act of 1845 was, to enable the party aggrieved to maintain an action at law, to ascertain and try the legality and validity of the demand and payment of duties, and, if the illegality was established, to petition to the secretary of the treasury, or to congress, for payment thereof, but not to enforce collection from the collector. If that is the sole purpose and purport of the act, the execution was irregularly issued, and must be set aside; otherwise, it is regular and according to due course of law.

Previous to the passage of the act of the 3d of March, 1839, it was well settled, that, at common law, a person might sustain an action for money had and received, against one who wrongfully withheld goods from him, upon an illegal claim or demand, colore officii, and thus compelled him to pay money to obtain them. Upon this point there is no conflict of authority, either in England or America. Shaw v. Woodcock, 7 Barn. & C. 73, 84; Irving v. Wilson, 4 Term R. 485. The last case, like the present, was against an officer of the excise or customs. There are many other English authorities to the same point, but it is unnecessary to cite them, as the question has been expressly decided, upon the most full and solemn deliberation, in two cases, by the supreme court of the United States. Elliott v. Swartwout, 10 Pet. [35 U. S.] 137; Bend v. Hoyt, 13 Pet. [38 U. S.] 263, 267. Both of these were actions against the defendants for money illegally demanded by and paid to them, colore officii, as collectors

of the port of New York. After these decisions, collectors of the customs claimed the right to retain money received by them for the government, as an indemnity against claims for excess of duties collected; and, in many cases, this retainer, with or without warrant of law, was resorted to, occasioning inconvenience, and often heavy losses to the government, by the ultimate bankruptcy and defalcation of the collectors.

To remedy this evil, the second section of the act of March 3, 1839, was passed. That section provides, "that from and after the passage of this act, all money paid to any collector of the customs, or to any person acting as such, for unascertained duties, or for duties paid under protest against the rate or amount of duties charged, shall be placed to the credit of the treasurer of the United States, kept and disposed of as all other money paid for duties is required by law, or by regulation of the treasury department, to be placed to the credit of said treasurer, kept and disposed of; and it shall not be held by the said collector, or person acting as such, to await any ascertainment of duties, or the result of any litigation in relation to the rate or amount of duty legally chargeable and collectible in any case where money is so paid; but, whenever it shall be shown, to the satisfaction of the secretary of the treasury, that, in any case of unascertained duties, or duties paid under protest more money has been paid to the collector, or person acting as such, than the law requires should have been paid, it shall be his duty to draw his warrant upon the treasurer in favor of the person or persons entitled to the over-payment, directing the said treasurer to refund the same out of any money in the treasury not otherwise appropriated." Afterwards, the question as to the construction to be given to that act came before the supreme court of the United States, at the January term, in 1845, in the case of Cary v. Curtis, 3 How. [44 U. S.] 236. That, too. was an action to recover money paid to the collector of the port of New York for duties. A majority of the court held, that the common law right of action against the collector was by implication, taken away by that statute, and said (page 252). that, "as the collector, since the statute, had power neither to retain nor refund, there could, as between him and the plaintiffs, arise no privity nor implication, on which to found the promise raised by the law only where an obligation to undertake or promise exists; and that, therefore, the action for money had and received could not, in this case, be maintained, but was barred by the act of congress of 1839." A minority of the court, Justices Story and McLean, dissented, and were of opinion that the statute of 1839 did not bar the common law right of action against the collector. Immediately after this decision was pronounced, congress passed the act of the 26th of February, 1845, which says, that nothing contained in the second section of the act of March 3d, 1839, "shall take away, or be construed to take away or impair, the right of any person or persons who have paid, or shall hereafter pay, money, as and for duties, under protest, to any collector of the customs, or other person acting as such, in order to obtain goods, wares, or merchandise imported by him or them, or on his or their account, which duties are not authorized or payable in part or in whole by law, to maintain any action at law against such collector, or other person acting as such, to ascertain and try the legality and validity of such demand and payment of duties, and to have a right to a trial by jury, touching the same, according to the due course of law; nor shall anything contained in the second section of the act aforesaid be construed to authorize the secretary of the treasury to refund any duties paid under protest; nor shall any action be maintained against any collector to recover the amount of duties so paid under protest, unless the said protest was made in writing, and signed by the claimant, at or before the payment of said duties, setting forth distinctly and specifically the grounds of objection to the payment thereof."

What was the purpose and intention of congress in passing that act? What was the mischief it was intended to remedy? We have seen that the act of 1839 deprived citizens of a common law right, and compelled them, when money had been illegally extorted from them, colore officii, to seek redress, by an appeal to the discretion and judgment of the secretary of the treasury, under whose instructions the money had been exacted—certainly a slow, vague, and very uncertain remedy. This was considered so unjust, that a minority of the court, in the case of Cary v. Curtis [supra], held, that if such was the construction to be given to the act of 1839, it was unconstitutional; and it is to be noted, that immediately after the decision of the court in that case, the act of 1845 was passed through both branches of congress and approved by the president. It is evident that only a few days could have elapsed between them. From these circumstances, as well as from the wording of the act itself, the inference would seem to be irresistible, that it was intended to restore the party aggrieved to his common law remedy, of which the act of 1839 had deprived him. It authorizes an "action at law," and "a right to a trial by jury," "according to the due course of law." Again it says: "Nor shall any action be maintained against any collector to recover the amount of duties so paid, * * * unless the said protest was made in writing." If it had been intended to give the plaintiff the right by suit at law only to ascertain and try the legality and validity of such demand and payment of duties, and, when he

had succeeded in establishing his claim, compel him to seek satisfaction by an appeal to the conscience of the secretary of the treasury, certainly some words would have been used to express such intent.

It is argued, however, that, inasmuch as the law makes it the duty of the collector to pay all moneys into the treasury, and he is forbidden to retain any in his own hands, it is hard to make him personally responsible for duties wrongfully exacted. But, there is no law compelling a person to accept the office of collector. If he does, it is a voluntary act, and he must take it subject to all the burdens and responsibilities which the law imposes upon it. Besides, it should be borne in mind that the right of a plaintiff to recover in such cases is based solely upon the tortious action of the collector, in compelling him, under color, but in violation of law, to pay money to obtain possession of his property. Upon every principle of justice and equity, therefore, if either party must suffer, it should be the wrongdoer.

Another fact is worthy of consideration, in determining this question. The act of 1845 has been in force almost sixteen years, during which time thousands of suits have been brought, and recoveries had, against the collectors of this and other ports; and it is understood that no question has ever heretofore been raised as to the personal liability of the collectors for the sums thus recovered. The contemporaneous construction of that act, and such long acquiescence therein, ought not now to be overturned, except upon the most clear and satisfactory grounds. The court has no doubt that the execution in this case was regularly issued, and the motion to set it aside is overruled.